| | AUSA: | John McCormack | Telephone: | (202) 262-7011 |
|---|---|---|---|---|
| AO 106 (Rev. 04/10)  Application for a Search Warrant | Special Agent: | Aaron Hann | Telephone: | (313) 392-8012 |

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case: 2:20-mc-50905 -2 |
| *(Briefly describe the property to be searched* | ) | Judge: Hood, Denise Page |
| *or identify the person by name and address)* | )   Case No. | Filed: 08-03-2020 At 07:59 PM |
| | ) | IN RE: SEALED MATTER(SW)(MLW) |
| 29560 BRADMOOR COURT | ) | |
| FARMINGTON HILLS, MICHIGAN 48334 | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A-2.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B-2.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 U.S.C. § 1347 & 1349 | Health Care Fraud & Conspiracy to Commit Health Care Fraud |
| Title 18, U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aaron Hann, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____August 3, 2020_____

_____
*Judge's signature*

City and state: _____Detroit, Michigan_____

Hon. Anthony P. Patti        U. S. Magistrate Judge
_____
*Printed name and title*

EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF THE SEARCH OF     :
     :
MARY E. BARNA, D.P.M. & ASSOCIATES, P.C.:
7445 ALLEN ROAD     :
SUITE #280     :  **UNDER SEAL**
ALLEN PARK, MICHIGAN 48101     :  Case: 2:20-mc-50905-2
     :  Judge: Hood, Denise Page
29560 BRADMOOR COURT     :  Filed: 08-03-2020
FARMINGTON HILLS, MICHIGAN 48334     :  IN RE: SEALED
     :  MATTER(SW)(MLW)
_____/

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

The undersigned, Aaron Hann, being first duly sworn, hereby deposes and states as follows:

1.    This affidavit is made in support of an application for a search warrant for the office of Mary E. Barna, D.P.M. & Associates, P.C. ("MBA") located at 7445 Allen Road, Suite 280, Allen Park, Michigan 48101 (hereinafter referred to as "Subject Premises 1").

2.    Subject Premises 1 is more fully described in Attachment A-1, while Attachment B-1 sets forth certain items and property, including but not limited to, financial records, patient records, computers, and other evidence, fruits and instrumentalities of criminal conduct to be seized.

3.    This affidavit is further written in support of an application for a search

1

warrant for the residence of Dr. Louis Bitoff, D.P.M. ("BITOFF"), a podiatrist

with MBA, located at 29560 Bradmoor Court, Farmington Hills, Michigan 48334

(hereinafter referred to as "Subject Premises 2").

4.      Subject Premises 2 is more fully described in Attachment A-2, while

Attachment B-2 sets forth certain items and property, including but not limited to,

financial records, patient records, computers, and other evidence, fruits and

instrumentalities of criminal conduct to be seized.

## AFFIANT'S BACKGROUND AND QUALIFICATIONS

5.      I, Aaron Hann ("Affiant"), am a Special Agent employed by the United

States Department of Health and Human Services, Office of Inspector General,

Office of Investigations ("HHS-OIG").  I have been so employed by HHS-OIG

since May of 2015.

6.      I am an investigative or law enforcement officer of the United States within

the meaning of Section 2510 (7) of Title 18, United States Code, in that I am

empowered by law to conduct investigations and to make arrests for federal felony

offenses.

7.      I am currently assigned to the Detroit Field Office, and as part of my official

duties, I am authorized to conduct investigations, audits, and inspections in

connection with the administration and enforcement of laws, regulations, orders,

contracts, and programs in which the United States Department of Health and Human Services ("HHS") is, or may be, a party of interest, and perform other duties on behalf of the Secretary of HHS. I have gained experience in how to conduct such investigations through specialized trainings, seminars, courses, and from my participation in previous HHS-OIG investigations.

8.      My duties and responsibilities as a Special Agent include conducting criminal investigations of individuals, organizations and businesses that have violated federal laws, including, but not limited to, those laws found in 18 U.S.C. § 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud) and 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims).

9.      Previously, from 2009 to 2015, I was a Special Agent with the United States Secret Service. There, I investigated fraud, financial crimes, and other crimes against the United States. Additionally, I was previously employed as a police corporal with the Dearborn, Michigan Police Department for nearly eleven years where I investigated a variety of violations of state law and local ordinances.

## PURPOSE OF THE AFFIDAVIT

10.     I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation, as well as information provided to me by other law enforcement agents involved in this investigation and others. Information

pertinent to this investigation was also provided by AdvanceMed (now known as CoventBridge Group), the current unified program integrity contractor for Michigan, which contracts with HHS to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse.

11.     I have been investigating MBA since January 2019 for violations of:

    A) Title 18 U.S.C. § 1347, Health Care Fraud;
    B) Title 18, U.S.C. § 1343, Wire Fraud;
    C) Title 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud and
        Wire Fraud; and
    D) Title 18, U.S.C § 287, False, Fictitious, or Fraudulent Claims.

12.     This affidavit is respectfully submitted in support of the Government's applications for search warrants of Subject Premises 1 and Subject Premises 2. Based upon my training and experience investigating wire fraud, health care fraud, conspiracy to commit health care fraud/wire fraud and the submission of false claims and the information set forth below, I have reason to believe, and do believe, that there are documents and items that are evidence, fruits and instrumentalities of violations of the following federal criminal statutes within Subject Premises 1 and Subject Premises 2:

    A) Title 18 U.S.C. § 1347, Health Care Fraud;
    B) Title 18, U.S.C. § 1343, Wire Fraud;
    C) Title 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud and
        Wire Fraud; and
    D) Title 18, U.S.C § 287, False, Fictitious, or Fraudulent Claims.

13.     I further submit that based on the evidence set forth below, and all

reasonable inferences from that evidence there is probable cause to believe that evidence, instrumentalities and fruits of these violations, as more fully described in Attachments B-1 and B-2, will be found within Subject Premises 1 and Subject Premises 2.

14.    Because this Affidavit is being submitted for the limited purpose of supporting search warrants, I have not included each and every fact known to me concerning this investigation.

## VIOLATION STATUTES

15.    Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

16.    Title 18, United States Code, Section 1343, prohibits wire fraud:  Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

17.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud, shall be subject to the same penalties as those proscribed in United States Code, Section 1347.

18.     Title 18, United States Code, Section 287, prohibits false, fictitious, or fraudulent claims against the United States: Whoever makes or presents to any person or officer in the civil . . . service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

19.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting

commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## THE MEDICARE PROGRAM

### A. BACKGROUND

20.     The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within HHS.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

21.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

22.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

23.     This investigation involves podiatry services which are covered by Medicare Part B.

24.     By becoming a participating provider in Medicare, enrolled providers agree

to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

25. Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for at least a period of six years.

26. CMS relies on a network of Medicare Administrative Contractors ("MACs") to process Medicare claims, and MACs serve as the primary operational contact between the Medicare Fee-For-Service program and the approximately 1.5 million health care providers enrolled in the program. MACs enroll health care providers in the Medicare program and educate providers on Medicare billing requirements, in addition to answering provider and beneficiary inquiries.

### B. MEDICARE BILLING/PROCEDURE CODES

27. The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology ("CPT") and Health Care Procedure Common Coding System ("HCPCS") codes. The codes are a systematic listing, or

universal language, used to describe the procedures and services performed by health care providers.

28.     The procedures and services represented by the CPT and HCPCS codes are health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b). They include codes for office visits, diagnostic testing and evaluation, and other services.  Health care providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to health care benefit programs.

29.     Health care benefit programs, including Medicare, use these codes to understand and evaluate claims submitted by providers and to decide whether to issue or deny payment.  Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT or HCPCS code.

30.     Health care providers often seek reimbursement from insurance carriers on CMS Form 1500.  On the form, the provider identifies itself by its Provider Identification Number ("PIN") or Tax Identification Number ("TIN"), identifies the beneficiary who received the services, describes the illness or injury that makes the services medically necessary, and identifies the services provided by CPT and HCPCS codes.  The insurance carrier will issue a payment or denial in response to the information contained in each CMS Form 1500.

31.     The Medicare Claims Processing Manual issued by CMS, is publicly

available, and offers day-to-day operating instructions, policies, and procedures

based on statutes and regulations, guidelines, models, and directives for Medicare

Part B.

32.     The Medicare insurance program only pays for medical procedures that are

"reasonable and necessary for the diagnosis or treatment of illness or injury," and

generally excludes from coverage "routine foot care," defined in part as "trimming

of nails" (Social Security Act§ 1862, 42 U.S.C. §1395y(l)(a)(13)(C)). Therefore,

under most circumstances, podiatrists cannot bill Medicare for routine foot care.

Some routine foot care procedures may be reimbursed by Medicare for certain

patients with systemic diseases of sufficient severity that performance of such

services by a non-professional person would put the patient at risk.  Such routine

foot care reimbursements under those codes are significantly lower than the

reimbursements for nail avulsions. Therefore, even if some routine foot care may

be reimbursable by Medicare billing those procedures using a nail avulsion code

constitutes a false claim.

33.     A nail avulsion is defined by Medicare as a "surgical procedure" that

involves the separation and removal of a border of, or the entire nail, from the nail

bed to the eponychium. The eponychium is the distal margin of the superficial

layer of a proximal nail fold that is a band of epidermis extending over the base of a nail. It is often referred to as the cuticle. For this procedure to be considered a nail avulsion, it must be performed using an injectable anesthesia except in the instances in which a patient is devoid of sensation or there are extenuating circumstances in which injectable anesthesia is not required or is medically contraindicated. Performing a nail avulsion can be billed to Medicare under CPT Codes 11730 and 11732.

| Procedure Code | Procedure Code - Long Description |
|---|---|
| 11730 | Avulsion of nail plate, partial or complete, simple |
| 11732 | Avulsion of nail plate, partial or complete, simple |

34.     Furthermore, "trimming, cutting, clipping or debriding of a nail, distal to the eponychium, will be regarded as routine foot care. It is not appropriate to report CPT codes 11730/11732 when performing these services." (Medicare Local Coverage Determination #L26424 - Rev. Eff. 03/01/10).

35.     Conversely, trimming or debriding of nails, if justified by a documented medical condition, can be billed to Medicare under CPT Codes 11719, 11720, and 11721.

| Procedure Code | Procedure Code - Long Description |
|---|---|

| 11719 | Trimming of non-dystrophic nails, any number |
|-------|----------------------------------------------|
| 11720 | Removal of tissue from 1 to 5 finger or toe nails |
| 11721 | Removal of tissue from 6 or more finger or toe nails |

## SUBJECT PREMISES

36.    MBA, Subject Premises 1, is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). It was incorporated under the name MBA, a podiatric office, on May 5, 1988.  LARA lists Mary E. Barna as the incorporator, president, treasurer, secretary, director and registered agent of MBA.

37.    During the course of this investigation, I obtained Medicare documents related to MBA which revealed that Subject Premises 1 is the listed practice location.

38.    On July 29, 2020, I entered the MBA practice during business hours and noted a desktop computer at the front desk and what appeared to be a large network printer in the back of the front desk area.

39.    BITOFF, is a member of the MBA practice.  BITOFF reassigned his existing Medicare billing privileges to MBA on January 26, 2006.  Reassignment allows MBA to bill Medicare for services provided by BITOFF.  BITOFF utilizes MBA for all of his "back office" services to include scheduling, storing medical records,

and billing for services he provides as a member of the MBA practice.

40.    Medicare billing records show MBA has been submitting BITOFF's Medicare billing since before January 2010.

41.    According to records from the United States Department of Homeland Security, BITOFF's home address is listed as Subject Premises 2, 29560 Bradmoor Court, Farmington Hills, Michigan 48334.

42.    Additionally, records obtained in June 2020 from J.P. Morgan Chase relating to BITOFF's personal bank account ending in x7068 list BITOFF as an authorized as a co-signatory on the account with his wife. BITOFF's address is listed as Subject Premises 2. The records reflect that from January 1, 2013, to May 31, 2020, MBA paid BITOFF approximately $1,287,821.69.

**OVERALL FRAUD SCHEME**

43.    Based upon information obtained by HHS-OIG and the Federal Bureau of Investigation ("FBI"), and a thorough review of Medicare claims data, there is probable cause to believe, and I do believe, that MBA (a) submitted and caused the submission of false and fraudulent claims to Medicare for services that were not medically necessary and/or were not provided to Medicare beneficiaries; and (b) submitted and caused the submission of false and fraudulent claims to Medicare for services beyond what was actually performed on the beneficiary, a practice

which is also known as upcoding.

## PROBABLE CAUSE

### A. MEDICARE ENROLLMENT INFORMATION

44.     Medicare records indicate that BITOFF has been a Medicare enrolled

provider since 1976.  As recently as October 2016, BITOFF re-certified to

Medicare that he would comply with all Medicare rules and regulations, including

that he would not knowingly present or cause to be presented a false and fraudulent

claim for payment by Medicare and would comply with the federal Anti-Kickback

Statute.

45.     MBA is a Medicare approved provider since at least 2006 and is assigned

the group provider transaction access number (PTAN) 0N35420.

### B. MEDICARE CLAIMS ANALYSIS

46.     Analysis of Medicare Part B data reveals that from January 2010 through

November of 2019, MBA, utilizing PIN 0N35420 for MBA, billed Medicare Part

B approximately $4,974,635.05 for services purported provided by BITOFF.

Medicare paid MBA approximately $2,501,477.02 for these claims.

47.     During the same time frame, MBA, on behalf of BITOFF, billed Medicare

Part B approximately $2,170,875.00 for CPT 11730 (separation of nail plate from

nail bed, also known as a nail avulsion) for services purportedly provided by

BITOFF.  Medicare paid MBA approximately $1,232,755.57 for these claims.

MBA billed Medicare for approximately 17,311 separate CPT 11730 claims.

48.     During the same time frame, MBA, on behalf of BITOFF, billed Medicare

Part B approximately $1,195,675.00 for CPT 11732 (separation of nail plate from

nail bed, also known as a nail avulsion) for services purportedly provided by

BITOFF.  Medicare paid MBA approximately $483,323.27 for these claims.

MBA billed Medicare for approximately 17,430 separate CPT 11732 claims.

49.     The following table summarizes MBA's billings to Medicare for claims

relating to CPT codes 11730 and 11732 on behalf of BITOFF from January 2010

to November 2019:

| CPT Code | Number of Claims | Amount Billed | Amount Paid |
|---|---|---|---|
| 11730 | 17,311 | $ 2,170,875.00 | $ 1,232,755.57 |
| 11732 | 17,430 | $ 1,195,675.00 | $ 483,323.57 |
| **Total** | **34,651** | **$ 3,366,550.00** | **$ 1,716,079.14** |

50.     During the course of the investigation, investigators interviewed some of

BITOFF's patients who revealed that that they have not received, nor required

treatment for these nail avulsion procedure codes.

51.     AdvanceMed performed a peer comparison of all podiatrists billing CPT

Code 11730 in the Midwest Region of the United States of America between

January 2010 and January 2019.  The peer comparison revealed that BITOFF

billed the most to Medicare for procedure 11730 over every other podiatrist in the Midwest Region of the United States in this timeframe.

52.    Additionally, below is a summary of all the nail trimming or debridement claims billed under CPT codes of 11719, 11720, and 11721 by MBA on behalf of BITOFF.  In summary, since January of 2010 to November of 2019, BITOFF billed nearly the same number of claims for CPT codes of 11719, 11720, and 11721 in total as the amount for claims for CPT codes 11730 and 11732.  BITOFF did not bill Medicare for any claims of CPT 11719.  BITOFF billed 168 total claims for 11720, and 16,787 total claims of 11721.  In total, BITOFF was paid $555,207.21 for these claims.  The following table summarizes MBA's billings to Medicare for claims relating to CPT codes 11719, 11720 and 11721 on behalf of BITOFF from January 2010 to November 2019:

| CPT Code | Number of Claims | Amount Billed | Amount Paid |
|---|---|---|---|
| 11719 | 0 | $ 0.00 | $ 0.00 |
| 11720 | 168 | $ 8,925.00 | $ 3,812.68 |
| 11721 | 16,787 | $ 1,141,272.00 | $ 551,394.53 |
| **Total** | **16,955** | **$ 1,150,197.00** | **$ 555,207.21** |

53.    Based on my training and experience, the nearly identical number of claims associated with CPT codes 11719, 11720, and 11721 compared to the number of claims associated with nail avulsions under CPT codes 11730 and 11732 (approximately 17,000 for each code), is a possible indication of upcoding and

billing for services not rendered. In short, based on my training and experience, it appears from the data that BITOFF simply added on nail avulsion billing, and often times a second nail avulsion, 11732, when he was only trimming and debriding his patients' nails by causing the submission of billing for the CPT codes for a nail avulsion, which have a higher reimbursement rate than the CPT codes for a nail debridement.

### C. WITNESS INTERVIEWS

### *MEDICARE BENEFICIARY B.W.*

54.    B.W. was interviewed by special agents of the FBI and HHS-OIG on January 27, 2020.

55.    B.W. said he/she was a patient of BITOFF from 2010 until 2016 when he/she started seeing podiatrist Dr. Cary Wolf. B.W. said he/she saw BITOFF every two to three months. B.W. further explained that he/she is diabetic and saw BITOFF so he could "check his/her feet," and trim his/her toenails.

56.    B.W.'s spouse supervises his/her treatment and performs any required aftercare because B.W. is unable to reach his/her feet. Both stated that BITOFF only performed one nail avulsion which was on his/her right big toe. B.W. advised that he/she has lost some feeling in his/her feet and can't always feel a light touch but certainly still feels pain.

57.    Between February of 2010 through June of 2016, BITOFF, via MBA, billed Medicare, on behalf of B.W., for 34 nail avulsions, CPT 11730, and 33 nail avulsions billed under CPT 11732 purportedly performed by BITOFF.  MBA billed Medicare $6,560.00 and was paid $3,461.85 in connection with those claims.

58.    Since being treated by Dr. Cary Wolf, B.W. has not had any nail avulsions and simply been billed for nail debridements and an evaluation.

### *MEDICARE BENEFICIARY M.N.*

59.    M.N. was interviewed by special agents of the FBI and HHS-OIG on February 27, 2020.

60.    M.N. said he/she has been a patient of BITOFF's since before 2010 and still presently sees him.  M.N. says he/she does not set appointments with BITOFF and that every three months she simply receives a call the day before explaining BITOFF will come out to his/her home.

61.    M.N. said BITOFF has never removed a toenail, given him/her any anesthetic, or given him/her an injection into his/her toes. M.N. confirmed he/she has full feeling in his/her feet.

62.    M.N. says he/she reviews all of her Medicare explanations of benefits ("EOB") and is surprised how much BITOFF is paid for a ten minute appointment.

18

63.     Since January of 2010, BITOFF via MBA has billed Medicare, on behalf of

M.N., for 43 nail avulsions, CPT 11730, and 44 nail avulsions billed under CPT

11732, purportedly performed by BITOFF.  MBA billed Medicare $8,345.00 and

was paid $4,282.98 in connection with those claims.

### *MEDICARE BENEFICIARY C.B.*

64.     C.B. was interviewed by special agents of the FBI and HHS-OIG on January

27, 2020.

65.     C.B. said he/she has been a patient of BITOFF since before 2010 and still

currently sees him every two to three months.  C.B. said BITOFF only trims

his/her nails for length and checks his/her feet.  C.B. said BITOFF has never

removed a toenail or administered any kind of injection into his/her toes.  C.B.'s

caretaker, C.H., was present for the interview and confirmed that C.B. has never

had a nail avulsion.  C.H. said he/she is responsible for all of C.B.'s aftercare and

has never been instructed by BITOFF regarding any aftercare.  Both stated the

appointments only last five to ten minutes.

66.     Since January of 2010, BITOFF, via MBA, has billed Medicare, on behalf of

C.B., for 34 nail avulsions, CPT 11730, and 35 billed under CPT 11732

purportedly performed by BITOFF.  MBA billed Medicare $6,695.00 and was paid

$3,480.66 in connection with those claims.

## *MEDICARE BENEFICIARY M.M.*

67.    M.M., and his/her adult child B.Z., were interviewed by special agents of the FBI and HHS-OIG on January 8, 2020.  B.Z. explained that the two live together and B.Z. is present for all of M.M.'s medical treatment.

68.    M.M. has been a patient of BITOFF since at least 2010 and still currently sees him every two to three months for regular foot checkups.  M.M. does not have diabetes and BITOFF trims his/her nails for length and grinds down some of the thickness of his/her nails.  After being provided the description of a nail avulsion procedure, B.Z. indicated that he/she watches the procedures that BITOFF performs on M.M. and that M.M. has never had a nail avulsion.  Further, B.Z. would be the person responsible for changing M.M.'s dressings after such a procedure.

69.    M.M. and B.Z. said that BITOFF has never given M.M. an injection in his/her foot or applied a numbing agent to M.M.'s feet, has never cut M.M.'s toe nails near the base of the nail or the cuticle, and has never bandaged M.M.'s feet. M.M. has never had any blood or oozing come from his/her toenails after BITOFF trimmed his/her nails.

70.    Since January of 2010, BITOFF, via MBA, has billed Medicare, on behalf of M.M., for 42 nail avulsions, CPT 11730, and 45 billed under CPT 11732

purportedly performed by BITOFF. MBA billed Medicare $8,300.00 and was paid $4,407.12 in connection with those claims.

### D. BITOFF INTERVIEW

71.     On July 14, 2020, BITOFF was interviewed on a recorded telephone call by a field investigator from Blue Cross Blue Shield ("BCBS"). BITOFF was at Subject Premises 2 during the call.

72.     During the interview, BITOFF advised BCBS that he began working for MBA in 2006.

73.     BITOFF described a nail avulsion as a procedure that requires a tool to get under the nail back to the nail matrix, then you use forceps to "yank that baby out." BITOFF advised that prior to the procedure, a topical refrigerant and antiseptics are used on the patient. After pulling the nail out with forceps, a dressing is applied if the patient is hemorrhaging or taking an anti-coagulant. When asked to explain his billings of repeated nail avulsion procedures on the same patient, BITOFF advised that he is conservative and does not take too much of the nail margin because the patient could start bleeding or be in pain, and without fail the nail grows back in eight to ten weeks which necessitates another nail avulsion procedure.

74.     BITOFF explained that he does not go into MBA often. After a procedure,

he comes home and types up notes regarding the patient encounters on a computer at his house.  BITOFF explained that he uses EZClaim Advanced electronic medical records software to generate patient records.  BITOFF prints out the records and delivers them to MBA about once per month.  BITOFF also indicated that he emails a data sheet to MBA summarizing what he did that day.

75.    BITOFF also referenced his use of "steno books" which he explained that he uses to write details about the procedures and indicated that he was in current possession of "an old one." BITOFF explained that the "steno-books" also contained patient signatures.

## REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

76.    Based on my training and experience, business offices rely upon computers to create and store data, including billing data.  It is likely that the providers' insurance billing, patient records, documents, and materials will be found stored on computers in Subject Premises 1 and Subject Premises 2.

77.    As articulated above, your affiant saw a computer and a printer inside Subject Premises 1 on July 29, 2020.

78.    As articulated above, BITOFF advised BCBS that he uses his computer at Subject Premises 2 to generate patient records summarizing his patient encounters via EZClaim Advanced software.  He ultimately provides those records with MBA.

BITOFF also indicated that he emails MBA a sheet summarizing his daily activities.

79.   For the reasons stated above, there is probable cause to believe that one or more computers at Subject Premises 1 and Subject Premises 2 were used to generate false billings and contain information including records, documents, and materials relating to these crimes.

80.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (computer personnel) will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data.  If computer personnel determine that these items cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the agents will seize the computer equipment and storage devices for the purposes of conducting an off-site search, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).

81.   If the computer personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the

court.

82.    Authority is sought to search any computer related equipment capable of creating and/or storing information in electronic or magnetic form for the items listed in Attachments B-1 and B-2.  "Computer related equipment" refers to:

    a.  Computer hardware, consisting of all equipment that can collect, analyze,  create, display, convert, store, conceal, or transmit electronic, magnetic, optical,  or similar computer impulses or data. Hardware includes, but is not limited to,  any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots" or  personal data assistants, "tablet" computing devices, smartphones, iPods or  other similar media devices, memory facsimile machines, and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard  drives, floppy disk drives and diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and  any and all storage devices); peripheral input/output devices (such as  keyboards, printers, scanners, video display monitors, mouse devices); and related communications devices (such as modems, cables and connections,  recording

equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

b. Computer software, that is, digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications programs;

c. Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.

> Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

d. Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals.

83. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines the material found on the premises is too voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized. Authority is sought to seize software, documentation and instruction manuals, operating logs and manuals, utility programs, compilers, interpreters, cabling and connectors, or any other equipment, programs, or software used to facilitate direct or indirect communication with the computer hardware and/or software.

84.    In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

85.    Based on the foregoing, and consistent with Rule 41(e) (2) (B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIAL INSTRUCTIONS REGARDING
## REVIEW OF SEIZED MATERIAL

86.     With respect to law enforcement's review of the seized material identified in Attachments B-1 and B-2, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

87.     If, during the review of the seized material, the review team finds potentially privileged materials, the review team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue. Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## CONCLUSION

88.     Based on the foregoing, there is probable cause to believe, and I do believe, that Subject Premises 1 and Subject Premises 2 will contain the items set forth in Attachments B-1 and B-2, which constitute evidence, fruits of crime, contraband,

and/or instrumentalities of the violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud) and Title 18, U.S.C § 287 (False, Fictitious, or Fraudulent Claims).

## **REQUEST FOR SEALING**

89.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.


Aaron Hann, HHS-OIG

Special Agent

Sworn to and subscribed before me on this __3rd_____day of August, 2020.

_____

HONORABLE ANTHONY P. PATTI

United States Magistrate Judge

Eastern District of Michigan

## ATTACHMENT A-2



Premises to be searched: Bitoff Residence, 29560 Bradmoor Court Farmington Hills, Michigan 48334, home of Dr. Louis Bitoff, D.P.M., who works at Mary E. Barna, D.P.M. & Associates, P.C.

The Bitoff Residence faces west and is on the east side of Bradmoor Court, just south of Cheswick.  The home's exterior is a reddish brown brick with beige wood siding.  The home has a brownish grey dimensional roof.  The address, "29560" is etched in a Limestone slab placed in the brick façade of the street facing view of

the garage.  The home has a circular concrete driveway.  There is an ornate short streetlight in the front bushes just east of the driveway.

## <u>ATTACHMENT B-2</u>

## ITEMS TO BE SEIZED

For the time period of January 1, 2010, to present - any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the scheme or a beneficiary of the scheme described in the affidavit.

This information may be stored or filed and includes any format in which the information may exist, including, without limitation, the media of hard copy, computer hard disc, digital storage devices, and computer discs:

1.   All records related in any way to patients of any of the above persons or businesses listed in Attachment A, including, without limitation, the following type of records: patient charts, files, records, insurance cards, licenses, identification cards, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, appointment books, telephone logs, physician notes, nursing notes, medical assistant notes, social worker notes, original patient or referral source listings.

2.   All documents constituting, concerning, or relating to bills, invoices and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3.   All financial and tax-related books, records and documents related in any way to the above persons or businesses, including, without limitation:

   a.   Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

   b.   Credit/Automatic Teller Machine/Debit card accounts;

c.  All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

d.  All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

e.  All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

f.  All financial statements, accounts payable/receivable, and credit reports.

4.  Documentation of all patient appointments or scheduling and patient sign-in sheets.

5.  All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

6.  All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

7.  All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or business.

8.  All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or business, and any other individual, company, physician or billing company.

9.   All Medicare handbooks, manuals, instruction materials, newsletters or other Medicare publications.

10.  Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

11.  Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

12.  All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, any data storage equipment, thumb or flash drives.  Any electronic storage media, including, without limitation, pagers, electronic organizers, and PDAs, which may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant.  Where data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices.  When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

13.  Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment which contains any of the aforesaid information.

14.  Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws and annual reports.

15.  All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

16.  Currency or other items of significant value reasonably believed to be proceeds, fruits or instrumentalities of the illegal activity described in the affidavit for this search warrant.

17.　　Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

18.　　Regarding records and information pertaining to the stated offenses in the affidavit which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

a.　Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.　If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c.　If the computer personnel determine it is not practical to perform on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.　Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

e.  In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f.  If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

g.  In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

   i.  Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

   ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

   iii.  Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

   iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

       v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

     vi.   Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

    vii.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

19.    The terms "records," "documents," "communications," and "applications," include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device).

## ADDENDUM TO ATTACHMENT B-2

With respect to law enforcement's review of the Devices, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the Devices (collectively, the "Review Team") are hereby authorized to review, in the first instance, the Devices and the information and materials contained in them, as set forth in this Attachment B-2.

If law enforcement determines that all, some, or a portion of the information or materials on the Devices contain or may contain information or material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team is hereby ordered to: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this addendum shall be construed to require law enforcement to cease or suspend the Review Team's review of the Devices upon discovery of the existence of Potentially Privileged Materials on one or more of the Devices.

AUSA: John McCormack     Telephone: (202) 262-7011
Special Agent: Aaron Hann     Telephone: (313) 392-8012

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

In the Matter of the Search of     )
*(Briefly describe the property to be searched*     )
*or identify the person by name and address)*     )    Case No.
29560 BRADMOOR COURT     )
FARMINGTON HILLS, MICHIGAN 48334     )
    )

Case: 2:20-mc-50905 -2
Judge: Hood, Denise Page
Filed: 08-03-2020 At 07:59 PM
IN RE: SEALED MATTER(SW)(MLW)

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the    Eastern    District of    Michigan    .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B-2.

**YOU ARE COMMANDED** to execute this warrant on or before    August 17, 2020    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    the presiding United States Magistrate Judge on duty    .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    August 3, 2020    7:08 pm

_____
*Judge's signature*

City and state:    Detroit, Michigan

Hon. Anthony P. Patti    U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*